(2008)
UNITED STATES of America, ex rel. Ted WHITTEN, Plaintiff,
v.
COMMUNITY HEALTH SYSTEMS, INC., as successor to Triad Hospitals, Inc., as successor to Quorum Health Group, Inc., Quorum Health Resources, Inc., and Quorum Health Resources, LLC, Defendants.
Civil Action No. CV202-189.
United States District Court, S.D. Georgia, Brunswick Division.
August 5, 2008.

ORDER
ANTHONY A. ALAIMO, District Judge.
Plaintiff/Relator, Ted Whitten, brought suit on behalf of the federal government against Defendants, Community Health Systems, Inc., as successor to Triad Hospitals, Inc., as successor to Quorum Health Group, Inc., Quorum Health Resources, Inc., and Quorum Health Resources, LLC (collectively, "Quorum"), seeking to recover damages and civil penalties arising from Defendants' alleged health care fraud against the federal government. Whitten seeks relief under the qui tam provision of the False Claims Act, codified at 31 U.S.C. §§ 3729-3733.
The case is before the Court on Defendants' renewed dispositive motion, which the Court has converted to a motion for summary judgment. Because certain observation area claims raised by Whitten have been settled by the government, Quorum's motion will be GRANTED in part. Because genuine issues of material fact are in dispute as to subsequent, unsettled observation area claims, and Whitten's other claims, Defendants' motion will be DENIED in part.

BACKGROUND
Whitten is a former employee of the Glynn-Brunswick Memorial Hospital Authority (the "Hospital Authority"), which owns and operates Southeast Georgia Regional Medical Center ("SGRMC"), located in Brunswick, Georgia, and Camden Medical Center ("CMC"), located in St. Marys, Georgia (collectively, the "Hospitals"). Between 1980 and January 2001, Whitten worked for the Hospital Authority in a number of positions, including Chief Operating Officer and head of the Compliance Department. During the time period at issue here, Whitten was in charge of the Hospitals' Compliance Department.
From 1989 through September 2000, Quorum managed the Hospitals under a management agreement with the Hospital Authority. By virtue of that relationship, Relator avers that Quorum caused false claims to be presented for payment under the federal Medicare program from 1997 through September 2000.
On January 14, 1997, Quorum renewed its management contract with the Hospital Authority. This agreement obligated Quorum to provide "key personnel," and manage the day-to-day affairs of the Hospitals, including the supervision of billing. Under the contract, the key personnel provided to the Hospitals included a Chief Executive Officer, Bert Whitaker, a Chief Financial Officer, Ray Owings, and an administrator for CMC.
The Centers for Medicare and Medicaid Services, formerly known as the Healthcare Financing Administration ("HCFA"), is a division of the U.S. Department of Health and Human Services. This agency administers Medicare, a government health care benefit program for senior citizens. The government uses private insurance companies, called fiscal intermediaries, to administer the program. The United States contracts with its fiscal intermediaries to pay hospitals for charges incurred by Medicare patients.
On September 29, 2000, the Hospital Authority terminated its management agreement with Quorum. On April 27, 2001, Quorum merged with Triad.[1] On November 21, 2002, Whitten filed his complaint under seal, pursuant to the False Claims Act. That law allows private parties, known as relators, to file suit on behalf of the federal government in cases where fraud is alleged to have occurred against the public fisc, or treasury.
On April 30, 2004, the United States declined to intervene in the case, and the Court unsealed the complaint. On September 22, 2004, Whitten filed an amended complaint. On November 16, 2004, the Court denied Quorum's first motion to dismiss for the most part, but did recognize that one fraudulent, scheme alleged by Relator was not legally viable. Dkt. No. 48 at 33-34.
Relator's surviving averments of health care billing fraud fall into five categories, which he contends took place at the Hospitals from 1997 until the Hospital Authority terminated its relationship with Quorum. Through numerous exhibits, Whitten describes the different methods that he claims Quorum used to defraud the government. In the first scheme, Plaintiff avers that Quorum executives at SGRMC caused false claims to be presented to the government for equipment, supplies, and routine services. Initially, Whitten sought recovery for fraud against two government programs for this sort of false billing, Tricare/CHAMPUS[2] and Medicare but, as discussed below, Whitten has abandoned his Tricare/CHAMPUS claims.
The second scheme described by Relator faults Quorum for causing false charges to be submitted for diagnostic tests in the Hospitals' observation area. Specifically, Whitten claims that medical necessity criteria were disregarded, and that signed physicians' orders were not obtained prior to medical testing. Whitten asserts that nurses made rounds, wrote orders, and then rubber stamped a physician's signature, or that physicians' orders were obtained after the procedure was performed.
In scheme three, which mirrors the first scheme, Whitten alleges that fraudulent bills were submitted from CMC to Medicare officials for equipment, supplies, and routine services.[3]
In scheme four, Relator states that Quorum presented false claims to the government for cardiac rehabilitation services. Whitten claims that these bills were false because a physician was not present in, or in the immediate vicinity of, the cardiac rehabilitation room during patient rehabilitation sessions. Plaintiffs fifth scheme avers that Defendants presented fraudulent claims for mental health services due to the fact that the Hospitals' mental health unit lacked a qualified mental health director and an employee with a Master's degree in Social Work.
The False Claims Act provides for fines ranging from $5,500 to $11,000 for each false claim submitted to the government for payment. 28 C.F.R. § 85.3(a)(9)(2008). In addition, the law provides that treble damages are recoverable, as calculated by the actual harm suffered by the government. Plaintiff seeks to recover, on behalf of the United States, actual and treble damages of over $30 million, plus civil penalties, and his attorneys' fees. Because the government declined to intervene, Relator is entitled to between twenty-five and thirty percent of any eventual recovery, with the balance going to the U.S. treasury. 31 U.S.C. § 3730(d)(2).
On November 19, 2002, two days before Whitten's complaint was filed, the government entered into a settlement agreement with the Hospital Authority regarding certain durable medical equipment claims submitted to the Tricare/CHAMPUS programs. Dkt. No. 252, App. 3 at 14 & 15. For more than two years prior to that date, federal prosecutors in the United States Attorney's Office for the Southern District of Georgia had been investigating the possible fraud.
During the course of the government's investigation, prosecutors issued numerous subpoenas to employees of the Hospital Authority and Quorum personnel. While the focus of the investigation was on fraud by the Hospital Authority, as to the Tricare/CHAMPUS programs, the government also sought information about certain Medicare payment practices. Medicare payment practices were related to the claims the government was investigating, because Medicare and Tricare/CHAMPUS billing were handled in a like fashion by use of a "Chargemaster," which is a billing program used by the Hospitals, listing hospital goods and services and corresponding prices.
Defendants contend that the documents produced to the government during the investigation revealed the "allegations and transactions of fraud" surrounding each of Whitten's claims. Plaintiff disputes that these documents disclosed the fraud that he contends occurred on Quorum's watch at the Hospitals. Relator notes that the government's investigation focused on improper billing of durable medical equipment as to the Tricare/Champus program, not other issues raised in Whitten's complaint.
Written declarations submitted to the Court from current and former government prosecutors support Whitten's view. Assistant U.S. Attorney James Coursey, who headed the civil side of the investigation discussed above, has stated that during the course of an investigation, it is customary for the government to draft its subpoenas broadly, to "cover all potentially relevant and useful documents, even where some of the information that may be produced would likely be beyond the current focus of the investigation." Dkt. No. 290, Coursey Decl. ¶ 16.
On March 15, 1999, the Medicare fiscal intermediary issued Medicare Bulletin 1836 to hospitals, which clarified, or reiterated, the prohibition on "unbundling," that is, charging Medicare separately for certain reusable items, supplies, and routine services. Dkt. No. 36, Ex. 48 (pages 201 & 202, according to the Court's electronic docket). According to Plaintiff, Defendants understood their duty to not charge Medicare for routine services and reusable equipment before Bulletin 1836 was issued. Nonetheless, Quorum failed to cease imposing such charges until well into the year 2000, even though SGRMC employee James Andersen told the Medicare fiscal intermediary's fraud and abuse investigator, Donna Davis, that the Quorum-run hospital had stopped doing so. Dkt. No. 36, Exs. 29 & 30 (pages 149-150 & 152, according to the Court's electronic docket); Dkt. No. 252, App. 28.
In February 2000, the Department of Justice issued subpoenas to SGRMC and CMC seeking, inter alia, reviews by Quorum of "billing practices and/or chargemaster practices." Dkt. No. 252, App. 15.
On August 16, 1996, the Medicare fiscal intermediary placed SGRMC on focused medical review for observation room services after an audit showed that forty-six percent of claims submitted between April and June 1996 had been denied. The fiscal intermediary's letter did not specify why the observation area charges were denied. Dkt. No. 252, App. 21.
On November 20, 1998, the Medicare fiscal intermediary placed SGRMC on focused medical review for certain claims, and sent a letter to the hospital requesting "[p]hysician orders and progress notes." Dkt. No 252, App. 26. On May 11, 1999, the Department of Justice subpoenaed CMC for eighty-eight patient records including "physician's notes, nurse's notes, and any physician phone-in orders or authorizations." Dkt. No 252, App. 27.
On December 29, 2000, SGRMC employee Debra Kalister sent a letter to Kathryn Duncan, an employee of the fiscal intermediary, which announced that the hospital would refund $136,000 to Medicare because the hospital had received reimbursement for patients placed on observation status without appropriate documentation of medical necessity or because patients' status had been changed to observation status improperly. Dkt. No. 252, App. 25.[4]
Further, in August 1996, the fiscal intermediary conducted a focused medical review of SGRMC's cardiac rehabilitation billing, after a review found a pattern of incorrect charges. In April or May, 2000, a SGRMC compliance department employee, Michelle Morris, asked the fiscal intermediary whether the cardiac rehabilitation physician supervision requirement could be satisfied by having an emergency room doctor nearby. Twice, the fiscal intermediary responded that rehabilitation services provided under such circumstances were not covered. Dkt. No. 252, Apps. 33 & 34. In November 2000, the fiscal intermediary again placed SGRMC on focused medical review after an audit showed a high denial rate for cardiac rehabilitation service claims.
There is some evidence that, in or around November 1999, the HCFA issued a "statement of deficiencies and plan of correction" to SGRMC with respect to the mental health unit of the hospital. Dkt. No. 252, App. 36. This document reported that the unit lacked a qualified clinical director.
Between September 2000 and January 2001, nine newspaper articles appeared in the Brunswick News discussing the federal government's investigation of the Hospital Authority for improper billing practices relating to unbundling of durable medical equipment as to the Tricare/CHAMPUS program. A tenth, related article appeared in the Report on Medicare Compliance, a national healthcare trade publication. Four articles mentioned that Quorum executives ran the Hospitals, but none stated that Quorum was under investigation. Indeed, one article quoted the Hospital Authority's chairman as stating that Quorum was not the focus of the federal investigation. Dkt. No. 252, App. 41. In another article, the Hospitals' lawyer stated that neither Medicare billing nor Quorum was under investigation by the government. Dkt. No. 252, App. 39.
In a different article, Hospital Authority board member Dr. Hubert Manning blamed Quorum for the federal investigation of the Hospitals, but Manning did not suggest that Quorum had also committed the Medicare fraud alleged by Whitten. Dkt. No. 253, App. 43. Moreover, the article in the Report on Medicare Compliance questioned whether the Hospital Authority or Quorum was responsible for any improper billing as to the Tricare program. Dkt. No. 253, App. 48.
Also, a few of the articles mentioned an internal audit of the Hospitals, and discussed that audit's findings as to the Tricare/CHAMPUS billing for durable medical equipment. The article in the Report on Medicare Compliance reported that the internal audit revealed that the hospital "had problems in several areas, including Medicare billing and the TRICARE overcharges." Id. at 2.
On April 9, 2001, SGRMC employee Gregory Britton filed a qui tam action in this Court against the Hospital Authority. UNITED STATES ex rel. Britton v. GLYNN-BRUNSWICK HOSP. AUTH., No. CV201-61, 2001 WL 34869504 (S.D.Ga. 2001). As is relevant here, the Britton complaint alleged that government reimbursements were sought for procedures or tests done without doctors' authorizations. Britton averred that the false claims were brought to the attention of "senior management" at the Hospitals, but nothing was done.
On June 12, 2002, Britton's complaint was unsealed as to the Hospital Authority. Thereafter, Britton's complaint was addressed in the government's settlement agreement with the Hospital Authority, which released the Hospital Authority from any liability for the fraud asserted by Britton. Dkt. No. 252, App. 3 at 4.
The settlement agreement provided that the government had certain civil claims for the period 1996 through 1999. Dkt. No. 252, App. 3 at 3. Under the terms of the settlement, the Hospital Authority paid $420,000 to settle the claims against it. In exchange, the government released the Hospitals and "any of their officers ... [and] agents" from any liability under the False Claims Act for "Covered Conduct." Dkt. No. 252, App. 3 at 4.
The settlement agreement defined "Covered Conduct" to include (1) billing "the TRICARE/CHAMPUS Program for durable medical equipment that should have been included in the room and board charge for certain TRICARE claims and not filed separately[;]" (2) billing charges "for durable medical equipment under revenue code 270 (Medical/Surgical Supplies and Devices) while durable medical equipment should have been billed under revenue code 290[;]"[5] and (3) billing Medicare for observation charges where the patients were "placed on observation status without appropriate documentation of medical necessity." Dkt. No. 252, App. 3 at 2.
On October 27, 2005, the Court granted summary judgment to Defendants, based on its finding that Whitten had released his claims against Quorum in his severance agreement with the Hospital Authority. On December 13, 2006, the Eleventh Circuit reversed and remanded the action to this Court. On February 20, 2007, the Court reopened the case. Defendants' renewed motion to dismiss Plaintiffs amended complaint was stayed to provide the parties time to depose Assistant U.S. Attorney Coursey. The parties filed supplemental briefs after Coursey's deposition, and the Court heard oral argument on the motion on May 14, 2008. Pursuant to the Court's order, the parties filed additional briefs during the first week of July 2008.

STANDARD OF REVIEW
Quorum's briefs urge the Court to place the burden of establishing the Court's jurisdiction on Whitten. Even after the Court converted the motion to one for summary judgment, Quorum has insisted that Relator bears the burden of establishing the Court's jurisdiction. Defendants have not controverted or discussed the authorities cited in the Court's conversion order, which cast doubt on Defendants' position. Dkt. No. 397 at 1; Dkt. No. 395 at 3.
In 1945, the Supreme Court explained that
Jurisdiction, therefore, is not defeated as `respondents seem to contend, by the possibility that the averments might fail to state a cause of action on which petitioners could actually recover. For it is well settled that the failure to state a proper cause of action calls for a judgment on the merits and not for a dismissal for want of jurisdiction. Whether the complaint states a cause of action on which relief could be granted is a question of law and just as questions of fact it must be decided after and not before the court has assumed jurisdiction over the controversy. If the court does later exercise its jurisdiction to determine that the allegations in the complaint do not state a ground for relief, then dismissal of the case would be on the merits, not for want of jurisdiction.
Bell v. Hood, 327 U.S. 678, 682, 66 S.Ct. 773, 90 L.Ed. 939.
Relatedly, the Fifth Circuit has rejected the burden-imposition suggested by Quorum in this sort of circumstance:
Where the defendant's challenge to the court's jurisdiction is also a challenge to the existence of a federal cause of action, the proper course of action for the district court (assuming that the plaintiffs federal claim is not immaterial and made solely for the purpose of obtaining federal jurisdiction and is not insubstantial and frivolous) is to find that jurisdiction exists and deal with the objection as a direct attack on the merits of the plaintiffs case. The Supreme Court has made it clear that in that situation no purpose is served by indirectly arguing the merits in the context of federal jurisdiction. Judicial economy is best promoted when the existence of a federal right is directly reached and, where no claim is found to exist, the case is dismissed on the merits. This refusal to treat indirect attacks on the merits as Rule 12(b)(1) motions provides, moreover, a greater level of protection to the plaintiff who in truth is facing a challenge to the validity of his claim: the defendant is forced to proceed under Rule 12(b)(6) (for failure to state a claim upon which relief can be granted) or Rule 56 (summary judgment)both of which place greater restrictions on the district court's discretion. The court must take the plaintiffs allegations as true when a Rule 12(b)(6) motion is raised, and in addition must determine that no genuine issue of material fact exists when a Rule 56 motion is granted.
Williamson v. Tucker, 645 F.2d 404, 415 (1981).[6]
Therefore, it is appropriate for the Court to apply the familiar summary judgment standard to Defendants' motion. Federal Rule of Civil Procedure 56(c) provides for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Facts are "material" if they could affect the outcome of the suit under the governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).
The Court must view the facts in the light most favorable to the non-moving party, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), and must draw "all justifiable inferences in his favor ...", United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1437 (11th Cir.1991) (en banc) (internal quotation marks omitted).

DISCUSSION

I. No Material Evidence Was Withheld from the Government
At the time of filing the complaint, a relator must serve the government with all material evidence he possesses regarding the alleged fraud. 31 U.S.C. § 3730(b)(2). According to Quorum, Whitten failed to meet this obligation, and dismissal is appropriate. Foster v. Savannah Commc'n, 140 Fed.Appx. 905, 908 (11th Cir.2005); United States ex rel. Pilon v. Martin Marietta Corp., 60 F.3d 995, 999-1000 (2d Cir. 1995).
According to Quorum, Whitten violated § 3730(b)(2) by withholding several material documents from the government. For starters, Whitten did not turn over his 2001 severance agreement with the Hospital Authority, in which he agreed not to accuse the Hospitals of violating the False Claims Act. Yet, during a March 2003 investigative interview, Whitten told the U.S. Attorney's office that a severance agreement had been made between Whitten and the Hospital Authority. Quorum complains that a copy of the agreement was not provided, and that the specifics were not discussed, at that time.
Whitten rejoins that he satisfied the requirements of § 3730(b)(2), and that Foster did not turn on the relator's failure to provide any particular document to the government. As Plaintiff notes, the pro se relator there failed to comply with the statute of limitations and did not attempt to satisfy any of the procedural requirements of the Act. The relator did not provide anything to the government, and her complaint was not filed under seal with the Court. 140 Fed.Appx. at 908. Plaintiff asserts that Foster is inapposite, as are the other cases Defendants cite.
The Court agrees. No authority supports the notion that failure to provide all tangentially-related, but immaterial, documents in the relator's possession to the government constitutes grounds for dismissal. Quorum's argument is inconsistent with the statute, which just requires that material evidence be turned over to the government.
The Court concludes that neither the government nor Whitten thought Whitten's severance agreement was relevant to the allegations against Quorum. Indeed, Coursey has indicated as much. Dkt. No. 141 at 88; see also United States ex rel. Whitten v. Triad Hosp., Inc., 210 Fed. Appx. 878, 881-82 (11th Cir.2006). Additionally, Quorum complains that Whitten withheld an October 2000 letter, which discussed Whitten's motivations for obtaining his severance agreement. Quorum also faults Whitten for withholding the Hospitals' release agreement with his wife, Bonnie Whitten, which was similar to his own. Neither document qualifies as relevant or material information with respect to Quorum's alleged fraud so as to bar Plaintiffs claims here.

II. Whitten's Claims Are Not "Based On" Publicly Disclosed Allegations or Transactions of Fraud
This case requires the Court to interpret the public disclosure bar of the False Claims Act, codified at 31 U.S.C. § 3730(e)(4)(A), which provides:
No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government [General] Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.
The legal standards applicable to the public disclosure bar have been interpreted with some variance by the federal circuit courts of appeal:
Predictably, these jurisdictional provisions too have led to extensive litigation and to circuit splits concerning the meaning of the words "based upon," "public disclosure," "allegations or transactions," "original source," "direct and independent knowledge" and "information." Virtually every court of appeals that has considered the public disclosure bar explicitly or implicitly agrees on one thing, however: the language of the statute is not so plain as to clearly describe which cases Congress intended to bar.
United States ex rel. Findley v. FPC-Boron Employees' Club, 105 F.3d 675, 681 (D.C.Cir.1997).
In interpreting the public disclosure bar under the governing law of the Eleventh Circuit, the district court considers whether the relator's lawsuit is "based in any part on publicly disclosed information." Cooper v. Blue Cross & Blue Shield, 19 F.3d 562, 567 (11th Cir.1994) (emphasis added).[7] Yet, public disclosures that do not accuse the particular defendant at issue in the litigation of fraud do not qualify as public disclosures that the entity knowingly violated the law. Id. at 566-67.
Requiring that allegations specific to a particular defendant be publically disclosed before finding the action potentially barred encourages private citizen involvement and increases the chances that every instance of specific fraud will be revealed. To hold otherwise would preclude any qui tam suit once widespreadbut not universalfraud in an industry was revealed. The government often knows on a general level that fraud is taking place and that it, and the taxpayers, are losing money. But it has difficulty identifying all of the individual actors engaged in the fraudulent activity.
Id. at 566.
Consequently, a "public document" that discusses possible wrongdoing, and mentions the defendant at issue in the case, even if it is critical of the defendant, does not constitute a public disclosure of the fraud unless it alleges that the company engaged in the wrongdoing at issue in the litigation. Id. at 567. "The purpose of the FCA was to enlist the public's help in uncovering specifically each and every perpetrator of fraud." Id. at 568 n. 12.
Whitten's complaint alleges four false billing schemes by Quorum of Medicare, relating to (1) durable medical equipment unbundling, as prohibited by Medicare Bulletin 1836, (2) billing for observation services without physicians' orders and medical necessity determinations, (3) cardiac rehabilitation claims submitted without physician oversight in the department, and (4) mental health unit claims submitted without a qualified medical director or social worker.
Quorum contends that Whitten's claims of fraud against it have been publicly disclosed (1) in investigations by the Justice and Defense Departments, (2) in audits by the Medicare and Tricare/CHAMPUS fiscal intermediaries, (3) in the news media, and (4) in Britton's qui tam suit, which was settled by the United States.
Because Whitten does not claim to be an original source, the Court's analysis of whether the claim is barred by 31 U.S.C. § 3730(e)(4)(A) is simplified.[8] The Court must determine whether the averments made by Whitten are based on prior public disclosures. If not, the statute allows Whitten to proceed with his case. The Court will consider the allegations or descriptions of transactions of fraud in Whitten's complaint, and whether the public disclosures relied on by Quorum bar Whitten's claims. Rockwell Int'l Corp. v. United States, ___ U.S. ___, ___, 127 S.Ct. 1397, 1409, 167 L.Ed.2d 190 (2007).
With respect to all of the claims asserted, the parties dispute whether the fiscal intermediary's focused medical review letters, other governmental regulators' notices, and certain government subpoenas, constitute "public disclosures" of the fraud described in Whitten's amended complaint.
Generally speaking, a governmental audit or investigation of transactions or allegations of false claims submitted to the government triggers the public disclosure bar. Battle, 468 F.3d at 762-63 (state audits of university constituted public disclosure of fraud by the university). Quorum asks the Court to expand this precedent to include disclosures made by government agents to third parties during the course of an audit or investigation, which are related, or similar, to later False Claims Act averments against a different party. Such an expansion is unwarranted, and contrary to Circuit precedent. Cooper, 19 F.3d at 566-68.
Simply put, the fiscal intermediary letters and government subpoenas do not allege or describe transactions of fraud by Quorum. As a result, they do not qualify as public disclosures of the fraudulent schemes described by Whitten. "[T]he Act bars suits based on publicly disclosed `allegations or transactions,' not information." United States ex rel. Dunleavy v. County of Delaware, 123 F.3d 734, 740 (3d Cir.1997)(quoting Wang ex rel. United States v. FMC Corp., 975 F.2d 1412, 1418 (9th Cir.1992)); see also United States ex rel. Springfield Terminal Ry. v. Quinn, 14 F.3d 645, 653-54 (D.C.Cir.1994).
As described above, Defendants maintain that each of Plaintiffs "schemes" was subject to one or more audits and investigations and has been disclosed publicly. In that respect, Quorum emphasizes the deposition testimony of SGRMC compliance department employee Michelle Morris. Accordingly, the import of Morris' testimony requires some consideration.
Former Assistant U.S. Attorney Paul Murphy was in charge of the criminal investigation involving Tricare/CHAMPUS fraud by the Hospital Authority. According to Morris' initial deposition, on July 15, 2007, she met with Murphy, before Whitten left the hospital's employ in August 2000, in a formal interview regarding the criminal investigation. Dkt. No. 287 at 104-05. Morris acknowledged that she met with Murphy because she was a "subject" of the investigation, and she provided a detailed summary of their supposed interview. Id. at 106-13. Later in the deposition, Defendants' counsel asked Morris whether the issues raised in Whitten's complaint were the subject of the government's prior investigation. Morris agreed that they were. Id. at 149-56.
During Morris' second deposition, on October 23, 2007, Morris again confirmed that she met with Murphy, with her attorney, John Malcolm, before August 2000. However, Morris could not recall any other details about the interview. Morris could not recall the place, or even the city, where the interview occurred. In contrast with her previous deposition, Morris also agreed at her second deposition that she did not know what the government was investigating at the time of her interview, beyond what was shown on certain government subpoenas.
In addition, Coursey and Murphy have refuted Morris' testimony that she was interviewed by any lawyers in their office. According to Murphy, Malcolm refused to allow Morris to be interviewed because she was a target of the investigation. Dkt. No. 341 at 6.
Based on the foregoing, it appears that Morris may have been mistaken about her meeting with federal prosecutors regarding fraudulent billing at the Hospitals. Given the inconsistencies in Morris' testimony pointed out by Whitten's counsel, and the submissions of Coursey and Murphy, the Court will not rely on Morris' testimony as evidence that Whitten's claims were disclosed publicly, as it appears to be confused, uncertain, and inaccurate.
With the general principles of law governing Defendants' motion described adequately, and these preliminary considerations resolved, the Court will now consider Plaintiffs allegations of fraud by category, and Defendants' arguments of public disclosure as to each.

A. Durable Medical Equipment Averments
Medicare Bulletin 1836, which was issued on March 15, 1999, stated that hospitals cannot charge Medicare separately for certain reusable items, supplies, and routine services. Notwithstanding this fact, Whitten asserts that Quorum delayed correcting the Chargemaster to remove such charges until on or about May 1, 2000, at SGRMC, and June 8, 2000, at CMC.
Quorum submits that allegations and transactions of fraud regarding unbundling of durable medical equipment at the Hospitals were the subject of several civil and criminal investigations and audits. Indeed, Whitten concedes that the government investigated and settled Tricare/CHAMPUS durable medical equipment claims with the Hospital Authority two days before he brought this action. Upon learning of this fact, Plaintiff has not pursued any discovery regarding such claims, and he has abandoned these claims. Dkt. No. 288 at 2.
Nonetheless, Whitten insists that his claim that Quorum billed Medicare separately and improperly for reusable supplies and equipment, and routine services, which are required to be included in the room rate, has never been disclosed publicly, and thus remains a viable basis for recovery. Quorum demurs and, alternatively, submits that these claims are not legally viable because the fraud was immaterial to the payment decisions under Medicare rules.

i. Andersen-Davis Correspondence
On November 15, 1999, SGRMC's Business Office Director, James Andersen, wrote a letter to Donna Davis, the Medicare fiscal intermediary's fraud and abuse investigator. Andersen wrote that he understood that SGRMC need not re-bill past claims, so long as it followed Bulletin 1836 prospectively. Andersen's letter stated (incorrectly, according to Whitten) that SGRMC was complying with Bulletin 1836. Davis' response indicated that while the fiscal intermediary considered this a serious issue, it was not planning any postpayment reviews.
Contrary to Defendants' argument, no part of this correspondence served as a public disclosure of Quorum's alleged fraud.[9] As Relator notes, these exchanges did not allege or describe any transactions of fraud. Rather, Andersen denied that fraud occurred. This exchange was a discussion between a hospital employee and the fiscal intermediary regarding the proper interpretation of payor bulletins about billing procedures, nothing more.

ii. The Government's Tricare/CHAMPUS Investigation
Quorum also contends that investigation by the Departments of Justice and Defense into improper billing at the Hospitals for durable medical equipment under Tricare/CHAMPUS should bar Plaintiff's claims of fraudulent billing of Medicare for routine services and reusable supplies and equipment. Defendants argue that the government's awareness of the fraud precludes Whitten's claim.
Specifically, Quorum emphasizes that it was subpoenaed during the investigation, along with Hospital Authority personnel. Quorum maintains that the Justice and Defense Department subpoenas and interviews were public disclosures. Quorum also notes that the subpoenas were not limited to Tricare/CHAMPUS, but asked for all documents relating to any government-funded payor. Assistant U.S. Attorney Murphy focused the investigation on Tricare/CHAMPUS, but asked about Medicare fraud, particularly mentioning Bulletin 1836. Quorum states that these subpoenas and interviews informed the "public"that is, persons not involved in the fraud, about allegations that Quorum submitted fraudulent durable medical equipment charges, as prohibited under Bulletin 1836. United States ex rel. Doe v. John Doe Corp., 960 F.2d 318, 322-24 (2d Cir.1992).
To the contrary, Whitten posits that a government demand for documents via subpoena does not qualify as a public disclosure. Whitten also submits that Quorum misstates the scope of the Tricare/CHAMPUS investigation by the Justice and Defense Departments. Several of the Brunswick News articles quote Hospital Authority officials who state that the investigation did not relate to Medicare billing issues, and Assistant U.S. Attorney Coursey confirmed that Medicare was never the focus of the durable medical equipment investigation. Dkt. No. 290, Coursey Decl. ¶ 31. "As no investigation into Medicare losses had been commenced, no efforts were made to calculate a loss to Medicare or any other payors." Id. ¶ 21.
Whitten argues that even if a member of the public had access to the 83,000 pages of documents produced by the Hospitals in response to the government subpoenas, that person would not know about the fraudulent billing alleged by Plaintiff. United States ex rel. McDermott v. Genentech, Inc., 05-147-P-C, 2006 WL 3741920, *8-9, 2006 U.S. Dist. LEXIS 90586, *26-29 (D.Me. Dec. 14, 2006).
Whitten also emphasizes that there has been no indication that anything revealed to the government during the Tricare/CHAMPUS investigation was ever disclosed to the public. After the 1986 amendments to the False Claims Act, the fact that the government has some information in its files about possible fraud does not demonstrate that there has been a public disclosure, and the government investigation itself is not a public disclosure. Williams, 931 F.2d at 1496.
In our view, a "public disclosure" requires that there be some act of disclosure to the public outside of the government. The mere fact that the disclosures are contained in government files someplace, or even that the government is conducting an investigation behind the scenes, does not itself constitute public disclosure.
United States ex rel. Rost v. Pfizer, Inc., 507 F.3d 720, 728 (1st Cir.2007).
It naturally follows that the investigation by the Justice and Defense Departments do not bar Whitten's case. "If providing information to the government were enough to trigger the bar, the phrase `public disclosure' would be superfluous." Id. at 729.
Defendants maintain that Rost does not address, or cast doubt on, the propositions that (1) a disclosure by the government to the "public" during an audit or investigation is a public disclosure, and (2) that disclosure to a single person outside the government is a public disclosure. Here, Quorum asserts, the disclosures to the hospital employees of the audits, reports, and subpoenas, constitute public disclosures. Doe, 960 F.2d at 323.
Whitten responds that Doe was rejected by United States ex rel. Schumer v. Hughes Aircraft, 63 F.3d 1512, 1518-19 (9th Cir.1995), vacated on other grounds, 520 U.S. 939, 117 S.Ct. 1871, 138 L.Ed.2d 135 (1997); see also United States ex rel. Stinson, Lyons, Gerlin & Bustamante v. Prudential Ins. Co., 944 F.2d 1149, 1161 (3d Cir.1991). The Schumer court rejected an argument that dissemination of government audits to employees of the defendant, and to a related third party, nondefendant (none of whom was alleged to be engaged in the fraud) constituted a public disclosure. Rather, the Schumer court concluded that "treatment of company employees as members of the public is unrealistic [,] ... [b]ecause disclosure of such allegations could reflect negatively on both [the defendant and the non-party]." Id. at 1518; see also United States ex rel. Ramseyer v. Century Healthcare Corp., 90 F.3d 1514, 1521 n. 4 (10th Cir.1996). Relatedly, a hospital must have this information to operate.
In sum, there is good cause to find that such a disclosure does not mean that the information has been disclosed to the "public" within the meaning of the statute. More concretely, though, Quorum has never described the particulars of what the government agents supposedly told the hospital employees about Quorum's alleged Medicare fraud, either in writing or verbally. As the Court has discussed previously, the documents Defendants have pointed to do not describe or allege fraud by Quorum. As a result, the Court rejects Defendants' reliance on Doe, which is distinguishable on its facts.
Whitten also argues that the fact that the government issued subpoenas to the Hospital Authority for records that included some Medicare-related information, and that employees of the Hospitals were questioned about Medicare-related billing practices during the course of the government's Tricare/CHAMPUS investigation, does not mean that this information was disclosed to the public. As Plaintiff notes, it is something of a stretch to contend that, by issuing subpoenas and conducting interviews, the government was giving out information. Instead, it seems evident that the government was seeking information. Defendants have argued as much, and have suggested that this was sufficient to bar Whitten's claims. Dkt. Nos. 299, 303, & 305. As alluded to above, that position is foreclosed by the 1986 amendments. Rost, 507 F.3d at 729.
The Court rejects Quorum's restrictive reading of Rost, and Quorum's reliance on United States ex rel. Mathews v. Bank of Farmington, 166 F.3d 853, 861 (7th Cir. 1999), as inconsistent with the governing law in this Circuit. Williams, 931 F.2d at 1496 ("Even if a government investigation was pending at the time [the relator] filed his qui tarn complaint, such fact would not jurisdictionally bar [the FCA claim].").
Beyond the limited media coverage, there is no evidence that any information about the Tricare/CHAMPUS investigation was ever revealed to the public. Even if evidence relating to all the claims raised by Plaintiff were disclosed to the government during the investigation (and there is no evidence that such occurred here), the government did not investigate those other claims. The 1986 amendments to the Act give relators standing to bring claims that were overlooked or ignored by the government. Rost, 507 F.3d at 728.
Quorum also contests Whitten's assertion that an averment of fraud made "in" an audit or investigation is not a public disclosure unless the subject matter of the investigation is that precise issue. Quorum argues that disclosure occurs whenever transactions or allegations of fraud are made during any administrative investigation or audit, regardless of the target of the investigation.
Quorum maintains that the plain language of the statute and the case law supports its approach. "No court shall have jurisdiction over an action ... based upon the public disclosure of allegations or transactions ...in a congressional, administrative, or [GAO] report, hearing, audit, or investigation." 31 U.S.C. § 3730(e)(4) (emphasis added); e.g., United States v. Alcan Elec. & Eng'g, Inc., 197 F.3d 1014, 1020 (9th Cir.1999).
Yet, as the Court has explained, it is significant that the governmental investigation did not reveal any allegations, or describe any transactions, of fraud by Quorum. Cooper, 19 F.3d at 566 & 568 n. 12. The distinction is not academic, nor does it mean that the Court accepts Quorum's characterization of Whitten's reading of the statute. Rather, an investigation could expand beyond its initial focus and reveal other fraud committed by an additional party, and such allegations could be disclosed to the public. The Court simply finds that this did not occur in this instance.
According to Quorum, certain allegations were disclosed in nine articles published between September 2000 and January 2001 in the Brunswick News. Quorum submits that six of the news articles implied that Quorum could face liability. Dkt. No. 252, Apps. 39-41; Dkt. No. 253, Apps. 43-45. According to Quorum, the Report on Medicare Compliance article quoted the internal audit, conducted by Professional Provider Services, Inc. ("PPS"), and publicized it. Thus, Quorum contends that the news articles disclosed the improper billing identified by PPS. United States ex rel. Eitel v. Evergreen Int'l Airlines, Inc., 886 F.Supp. 750, 753 & n. 2 (W.D.Wash.1995).
Whitten rejoins that the news articles contain generalized information about the Tricare/CHAMPUS durable medical equipment allegations only. Indeed, several of the articles disclaim any averment of wrongdoing involving either Quorum or Medicare. Whitten also points out that the news article referencing the PPS report is not specific, and that the internal PPS audit itself is not a public disclosure. Williams, 931 F.2d at 1499. According to Relator, none of the articles disclosed the fraud alleged by Plaintiff. Cooper, 19 F.3d at 567.
Quorum asserts that it does not matter that some articles said that Quorum was not being investigated. Quorum argues that a media report need not allege or imply that a party committed fraud for it to count as a public disclosure. As the Court has stated in a slightly different context, this argument is rejected. Under governing precedent, a media report does not constitute a "public disclosure" of allegations of fraud by an entity unless it reports on allegations that the company engaged in fraud. Id. at 566-68.
The articles reported on the federal investigation into the Tricare/CHAMPUS durable medical equipment unbundling charges by the Hospital Authority. The media reports disclose an investigation of Tricare/CHAMPUS, not Medicare. None of the articles contain allegations that Quorum caused the Hospital Authority to submit false claims to Medicare. Whitten's complaint was not "based on" the news articles cited by Quorum, or any other document related to the government's Tricare/CHAMPUS investigation.

iii. The Materiality of the Fraud
Defendants also cite to a recent decision by Chief Judge William T. Moore, Jr., that, according to Quorum, casts doubt on Whitten's ability to recover for improper Bulletin 1836 charges. United States ex rel. Digiovanni v. St. Joseph's/Candler Health Sys., Inc., No. CV404-190, 2008 WL 395012 (S.D.Ga. Feb. 8, 2008). In Digiovanni, the court found that, because Medicare reimburses hospitals for admissions at a predetermined rate, itemized charges, whether in compliance with Bulletin 1836 or not, are immaterial to the payment decision. Id. at *5-6; see also Dkt. No. 335, Ex. B, Coursey Dep. at 88, 99-100.
Likewise, in Allison Engine Co. v. United States ex rel. Sanders, the Supreme Court explained that
What § 3729(a)(2) demands is not proof that the defendant caused a false record or statement to be presented or submitted to the Government but that the defendant made a false record or statement for the purpose of getting "a false or fraudulent claim paid or approved by the Government." ... If a ... defendant makes a false statement ... and does not intend the Government to rely on that false statement as a condition of payment, the statement is not made with the purpose of inducing payment of a false claim "by the Government."
___ U.S. ___, ___, 128 S.Ct. 2123, 2130, 170 L.Ed.2d 1030 (2008).
Furthermore, "it must be established that ... the false record or statement would have a material effect on the Government's decision to pay the false or fraudulent claim." Id. at 2130-31.
In Digiovanni, as in the instant case, the complaint averred that the defendant disregarded Bulletin 1836 and submitted improper bills for supplies and reusable medical equipment. 2008 WL 395012 at *1. Chief Judge Moore found that such submissions were immaterial, as they did not affect the amount reimbursed to the hospital. Instead, the court concluded that Medicare reimburses hospitals at a standard rate based on the patient's diagnosis. Id. at *6.
In contrast, in the instant case, there appear to be genuine issues of material fact regarding whether any routine supply and durable medical equipment charges led to overbilling and false claims paid by the federal government. According to Plaintiff, the routine charge for inpatient services was increased by certain improper billings for reusable equipment and supplies, which Quorum caused to be submitted to the government.
Whitten submits that the charges for routine supplies should have been included in the patient's diagnosis-related group, as determined by the Hospitals, at Quorum's direction. Instead, Whitten contends that Quorum added these charges on top of the normal patient rate paid by Medicare. While Relator allows that not all of those charges were paid by Medicare, he does contend that a percentage of such overcharges were, based on an "outlier sharing factor."
Defendants dispute Plaintiffs assertion that any "outlier" claims are present in this case, but Quorum has not briefed the issue, or explained why such claims are not legally viable here. Without such a showing, the Court does not reject Relator's Bulletin 1836 claims as a matter of law. Such an argument was either not raised, or not considered, by the Digiovanni court, and as such, that decision does not inform the Court's analysis.

B. Observation Area Charges
With respect to improper observation area charges, Whitten submits that physicians' orders were not obtained before procedures, services, and supplies were provided, to confirm medical necessity for the same. Whitten faults Quorum for failing to put appropriate computer software into place to verify medical necessity before such services were performed, or submitted to Medicare for payment.
Quorum maintains that these allegations are foreclosed because they are similar to claims raised in a prior lawsuit, and are precluded by the government's settlement agreement with the Hospital Authority.[10] The Court will examine each argument in turn.

i. The Britton Lawsuit
Under the False Claims Act's "first to file" bar, "[w]hen a person brings an action under this subsection, no person other than the Government may intervene or bring a related action based on the facts underlying the pending action." 31 U.S.C. § 3730(b)(5). "[O]nce one suit has been filed by a relator or by the government, all other suits against the same defendant based on the same kind of conduct would be barred." Cooper. 19 F.3d at 567 (emphasis added).
On April 9, 2001, Gregory Britton filed a qui tam action in this Court against the Hospital Authority. The only similar averment in the two complaints relates to the alleged performance of procedures without doctors' orders. Notably, the Britton complaint was not filed against Quorum, and did not assert that Quorum engaged in fraud. Id. (distinguishing between a criticism of a defendant and an actual allegation of fraudulent conduct).[11] Because Whitten's complaint alleged fraud by Quorum, and Britton's did not, Whitten's complaint is not barred by the first to file rule.

ii. The Government Settlement
Quorum posits that two of Whitten's claims are subject to dismissal because they have already been settled. A qui tam relator has standing to sue only by virtue of an implicit assignment of rights from the federal government, Vt. Agency of Natural Res. v. United States ex rel. Stevens, 529 U.S. 765, 773-74 & n. 4, 120 S.Ct. 1858, 146 L.Ed.2d 836 (2000), and the parties agree that a relator cannot pursue claims the government has settled, see United States ex rel. Barajas v. Northrop Corp., 147 F.3d 905, 910 (9th Cir. 1998).
However, the parties disagree over the scope of the government's settlement with the Hospital Authority, and whether the settlement inures to the benefit of Quorum. More specifically, there is no dispute that the government settled all the claims it had with respect to the Hospitals' unbundling of durable medical equipment as to the Tricare/CHAMPUS program, and Plaintiff has abandoned his claims asserting fraud in that respect. However, the parties disagree over the settlement's impact on Whitten's observation area claims.
In November 2002, the Hospital Authority settled certain claims with the government, which released the Hospitals, and "any of their officers, directors, employees, [and] agents[,]" from any liability under the False Claims Act for "Covered Conduct." "Covered Conduct" included billing Medicare for "patients placed on observation status without appropriate documentation of medical necessity." Dkt. No. 252, App. 3 at 2.
Because the government's settlement agreement with the Hospital Authority affects federal rights or interests, federal common law controls the interpretation of the agreement. Clearfield Trust Co. v. United States, 318 U.S. 363, 366-67, 318 U.S. 744, 63 S.Ct. 573, 87 L.Ed. 838 (1943). Under federal common law, the Court looks to the intent of the parties to interpret the contract. Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 347, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971). "The clearest manifestation of this intent is the express terms of the written agreement." Coleson v. Inspector Gen. of Dep't of Def., 721 F.Supp. 763, 768 (E.D.Va. 1989). Where the terms of the contract are unambiguous, the Court will not look outside the four corners of the document to determine its meaning. See generally 66 Am.Jur.2d Release § 29 (2008).
Whitten disputes Quorum's contention that it is entitled to the benefit of the settlement agreement. Although Plaintiff has not elaborated on this argument, the Court assumes that Relator is asserting that Defendants were not covered by the agreement because Quorum was no longer affiliated with the Hospital Authority at the time the settlement agreement was signed. In other words, Whitten suggests that the agreement did not cover former agents of the Hospital Authority.
The terms of the agreement states that "agents" of the Hospital Authority are released, and does not specify whether "current" and/or "former" agents were covered by the contract. Nonetheless, neither party to this action has suggested that the clause is ambiguous or has attempted to introduce external or parol evidence to clarify the intent of the government or the Hospital Authority.
In the absence of any language to the contrary in the settlement agreement, the Court is not inclined to accept Whitten's construction of the contract. The Court concludes that, because Quorum was an agent of the Hospital Authority during the time when the alleged fraud occurred, Quorum was released by the settlement agreement. Also, Quorum was released because its employees, Owings and Whitaker, were officers of the Hospitals during the relevant time period.
This result is the most natural construction of the words used by the parties to the contract. It is apparent that the government could not recover for the alleged fraud against new, "current" agents of the Hospital Authority, whose service as agents started after the alleged fraud occurred. Instead, the only sensible reading of the document is that it was designed to protect those agents and officers who worked for the Hospital Authority during the relevant time period when the alleged fraud occurred. See Horizon Fin., F.A. v. Hansen, 791 F.Supp. 1561, 1569-72 (N.D.Ga.1992) (applying Pennsylvania law, attorneys at the time the alleged wrongdoing occurred were covered as "agents"); Mallette v. Taylor & Martin, Inc., Real Estate, 225 Neb. 385, 406 N.W.2d 107, 108-111 (1987)(release of home sellers released former real estate agent as well); see also Dkt. No. 154 at 8-9. Moreover, during Coursey's deposition, he conceded that the settlement agreement applied to Whitten's observation area claims. Dkt. No. 335, Ex. B, Coursey Dep. at 59-62.
Still, this finding does not absolve Quorum of all responsibility for the observation area claims raised in Whitten's complaint. The settlement agreement provided that the government had certain civil claims for the period 1996 through 1999. Notwithstanding this fact, Quorum argues that the agreement released conduct through or beyond the date it was executed by Coursey on behalf of the government, November 19, 2002. Quorum bases this conclusion on the fact that the agreement required the Hospitals to conduct an internal audit of their billing procedures for durable medical equipment during the year after the settlement agreement became effective. Dkt. No. 252, App. 3 at 7.
The Court concludes that this contractual requirement does not expand the time period of the release. Instead, as Whitten contends, because Quorum was an agent of the Hospitals through September 29, 2000, it may be liable for nine months of unreleased conduct as to any unsettled observation area fraud that occurred.
Contrary to Quorum's position, there is no "gap" in the "released conduct" coverage time because of the self-audit requirement. The audit was simply an additional item of consideration paid by the Hospital Authority to the government to settle the parties' dispute. It did not create or purport to extend immunity for any additional time period to the Hospitals, their agents, or officers. Rather, the contract only released such entities and individuals for conduct that occurred during the time period set out in the agreement, 1996 to 1999. Liability for any false claims submitted thereafter is a separate matter.[12]

C. Cardiac Rehabilitation and Mental Health Unit Claims
According to Whitten, Quorum violated the False Claims Act by causing fraudulent Medicare billing due to the fact that a physician was not present in, or in the immediate vicinity of, the cardiac rehabilitation room during patient rehabilitation sessions. Quorum relies on two focused medical review letters to SGRMC in support of its argument that Whitten's claims were disclosed publicly.
For the reasons discussed previously, the Court concludes that the fiscal intermediary's focused medical review letters to SGRMC, concerning the cardiac rehabilitation unit, did not constitute allegations, or describe transactions, of fraud by Quorum.[13]
Whitten also alleges that false claims were submitted to the government while the Hospitals' mental health unit lacked a physician medical director and an employee with a Master's degree in Social Work. Quorum cites to the "statement of deficiencies and plan of correction," which it asserts was issued in November 1999 by the HCFA to SGRMC, as evidence of a prior public disclosure of the fraud.
As Plaintiff notes, this document is a single faxed page and, as submitted, is incomplete. Also, the statement refers only to the lack of a qualified clinical director in the unit. More significantly, the document does not allege any fraud by Quorum. The HCFA statement was not a public disclosure of Whitten's allegations.
Quorum also contends that the cardiac rehabilitation and mental health claims relate to violations of Medicare conditions of participation, not conditions of payment. According to Quorum, such violations do not give rise to False Claims Act liability as a matter of law. United States ex rel. Willard v. Humana Health Plan of Tex., Inc., 336 F.3d 375, 381-83 (5th Cir.2003); but see Shaw v. AAA Eng'g & Drafting, Inc., 213 F.3d 519, 530-31 (10th Cir.2000) (recognizing an implied certification theory of liability).
In November 2004, the Court declined to dismiss these claims based on a similar argument made by Quorum. The Court noted that the possible shortcomings appeared serious, and could be a valid basis for the government to deny reimbursement altogether if it knew about the lack of a qualified medical director or qualified social worker in the mental health unit. Dkt. No. 48 at 35-38. Likewise, the government could have denied cardiac rehabilitation claims because there was no medical doctor overseeing the provision of services there. See Dkt. No. 252, App. 33 (wherein the fiscal intermediary states that such "charges are not billable"). As a result, it is not evident to the Court that recovery would be foreclosed in this instance because the violations were mere "regulatory," technical shortcomings. See United States ex rel. Landers v. Baptist Mem'l Health Care Corp., 525 F.Supp.2d 972, 978 (W.D.Tenn.2007).[14]
The Court notes that, in contrast to the other claims addressed herein, Quorum has not briefed or argued this point of law thoroughly. Instead, its first appearance (in this motion) was made in a brief aside in a footnote on the final page of a supplemental brief, which was filed at 8:33 P.M. on the evening that both parties were required to submit any additional materials for the Court's consideration in deciding Defendants' dispositive motion. Dkt. No. 397 at 7 n. 3.
The Court's order, giving the parties until July 7, 2008, to file any additional materials, did not provide time for additional briefing beyond that date on new legal arguments, and Plaintiff has not sought to file any responsive brief addressing these contentions past the due date. Given these facts, the Court declines to dismiss the cardiac rehabilitation and mental health unit claims for the reason urged by Defendants at this time.

CONCLUSION
For the reasons explained above, Defendants' motion for summary judgment is GRANTED in part, and DENIED in part. Dkt. No. 248. Whitten is precluded from recovery as to that portion of the observation area allegations that were settled by the government, but Quorum is not entitled to judgment as a matter of law as to the other allegations raised in Whitten's complaint.
In accordance with Federal Rule of Civil Procedure 17, the Court DIRECTS the Clerk to correct the docket to reflect that Community Health Systems, Inc., is the successor corporation to Triad Hospitals, Inc., and as such, is the real party in interest. Dkt. No. 251.
NOTES
[1] On July 25, 2007, Community Health Systerms, Inc., acquired Triad.
[2] During the time relevant to this litigation, the Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS") was a health care benefit program for retired armed forces personnel and dependants of active and retired military personnel, which Tricare supplemented. United States v. Whiteside, 285 F.3d 1345, 1346 (11th Cir.2002). Quorum notes that the CHAMPUS program is now known as TRICARE. 71 Fed.Reg. 60114 (Oct. 12, 2006).
[3] For the sake of clarity, the Court will treat schemes one and three as one "scheme" in the discussion below.
[4] Plaintiff notes that his complaint does not aver that patients were held improperly in observation status rather than released or admitted as inpatients, which Is a compliance fault revealed by Kalister. Rather, Whitten contends that "supplies, equipment and services in the observation area were routinely rendered without first requiring requisite orders and signatures of physicians indicating the medical necessity" therefor. Dkt. No. 36 ¶ 31.
[5] The government asserted that the claims would have been denied, had they been coded correctly.
[6] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.
[7] Defendants seize upon Cooper's description of the "based on" standard as a "quick trigger to get to the more exacting original source inquiry." Id. at 568 n. 10. But this language' does not relieve the Court of its statutory duty to ensure that the averment of fraud is contained in a public disclosure before inquiring into whether relator is an original source. Indeed, in this case, Whitten does not contend that he qualifies as an "original source" under the statute because he made no disclosures to the government prior to filing his complaint. "The `original source' inquiry only becomes necessary once a court makes a factual determination that the particular qui tam suit before it was based upon information that was publicly disclosed." United States ex rel. Williams v. NEC Corp., 931 F.2d 1493, 1500 (11th Cir.1991).
[8] "[A] plaintiff basing an FCA claim in any part on ... publicly disclosed information must demonstrate that the plaintiff is an original source of that information." United States ex rel. Battle v. Bd. of Regents, 468 F.3d 755, 762 (11th Cir.2006).
[9] This discussion assumes, arguendo, that these documents were "public disclosures." The Court has already determined that the letters would not qualify as such because they do not allege or describe any transactions of fraud by Quorum or Quorum officials.
[10] As the Court has discussed, the focused medical review letters to SGRMC regarding observation area charges were not public disclosures of fraud by Quorum. There is nothing in any of the observation area-related document requests cited by Quorum that alleges fraud, or describes transactions of fraud, by Quorum. Dkt. No. 252, App. 21.
[11] In general, both complaints alleged that "senior management" at the Hospitals was aware of the observation area fraud but allowed requests for reimbursement to continue. Quorum argues that Britton's implication was that "senior management" meant Quorum. This is a conceivable, but not inescapable, inference. In any event, this inference would not be enough to preclude Whitten's case under Cooper. According to Britton, liability rested elsewhere; any "criticism" of Quorum does not alter the analysis.
[12] The settlement agreement acknowledged a voluntary disclosure by SGRMC to the government that the hospital had refunded an undisclosed amount of money to Medicare because SGRMC received reimbursement for patients placed on observation status without appropriate documentation of medical necessity, among other violations. According to a letter dated December 29, 2000, from SGRMC employee Debra Kalister to Kathryn Duncan, an employee of the fiscal intermediary, which revealed the overpayments, the total amount repaid was $136,000. Yet, a letter from the Hospital Authority's outside counsel, William R. Mitchelson, Jr., dated May 6, 2004, intimates, based on sampling done by an accounting firm, that the true amount overcharged for these violations was about $401,572 at SGRMC and about $65,506 at CMC. Mitchelson reported that, due to certain errors contained in Kalister's letter, the net amount to be refunded to the government was $344,704, not $331,078. Dkt. No. 252, Ex. 25. According to Plaintiff, the balance was never repaid to the government.
[13] Additionally, the Court notes that these letters do not appear to coincide with Whitten's allegations. The August 19, 1996, focused medical review letter states that several cardiac rehabilitation claims by SGRMC were denied because of a lack of information provided or because cardiac rehabilitation exceeded "Fred/Duration." And the November 2000 focused medical review letter does not mention the physician supervision requirement.
[14] Defendants also cite, but do not submit as evidence, the Medicare Program Integrity Manual, Ch. 3, § 3.4.2.1. Consequently, the Court offers no opinion regarding whether this source impacts the viability of Plaintiff's cardiac rehabilitation and mental health unit claims.